IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CERTIFICATION TRENDZ, LTD.; and FREETECH SERVICES, LTD., | ) ) ) ) |
| Plaintiffs, | ) ) ) Case No. 1:16-cv-1048 |
| v. | ) ) ) |
| KASHIF RASHID a.k.a. "KASHIF RASHEED"; JAMAL RAMZAN; ARIEL JAMES; ITSOLEXPERT, LTD.; QTECHSOL, LTD.; ALPOLINK (UK) LTD.; SELFTESTTRAINING, LTD.; EXAMTRENDS, LTD.; and JOHN DOES 1–25, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## ORDER

The matter came before the Court on plaintiffs Certification Trendz, Ltd. and Freetech Services, Ltd.'s motion for a temporary restraining order pursuant to Rule 65(b), Fed. R. Civ. P. Plaintiffs filed their motion, as permitted by Rule 65(b), Fed. R. Civ. P., without providing notice to defendants Kashif Rashid, Jamal Ramzan, Ariel James, Itsolexpert, Ltd., Qtechsol, Ltd., Alpolink (UK) Ltd., Selftesttraining, Ltd., Examtrends, Ltd., and John Does 1–25. Plaintiffs intended that an *ex parte* hearing would be held on their motion at 10:00 a.m. on Friday, August 26, 2016. Three defendants — Kashif Rashid, Jamal Ramzan, and Alpolink, Ltd. — discovered plaintiffs' filing on Wednesday, August 25, 2016.[1] As a result, despite plaintiffs' intention, counsel for those three defendants filed a written response on the afternoon of Thursday, August

---

[1] It appears that those three defendants discovered plaintiffs' motion by monitoring the Court's docket on PACER.

25, 2016, and appeared at the next day's hearing. For the reasons stated from the bench, and for the reasons elucidated in this Order, plaintiffs' motion was granted in part at 4:00 p.m., on Friday, August 26, 2016.

## I.

Plaintiffs filed a complaint on August 16, 2016, alleging federal trademark infringement and cybersquatting claims, as well as related state law claims. All of those claims were based on defendants' use of plaintiffs' various (36) trademarks on defendants' websites.[2] The following facts are based on exhibits and a sworn declaration submitted by Thomas Ashley, an information technology litigation consultant and software dispute specialist who analyzed defendants' websites. (Doc. 7). *See* Rule 65(b)(1)(A), Fed. R. Civ. P.

Plaintiff Certification Trendz owns the federally registered trademark TEST KING®. (Doc. 1, Ex. 9). Plaintiff FreeTech owns the federally registered trademark PASS4SURE®. (*Id.* at Exs. 10–11). Plaintiffs use those trademarks to sell preparation materials for tests in the information technology field. (*Id.* at Exs. 9–11). Plaintiffs have registered the domain names

---

[2] Those 36 website domain names are: (1) allpass4sure.com, (2) apass4sure.net, (3) apass4sures.com, (4) apass4sures.net, (5) ccnapass4sure.com, (6) freepass4sure.com, (7) ipass4sures.co, (8) originaltestking.com, (9) originaltestking.net, (10) pass4-sure.com, (11) pass-4sure.com, (12) pass4sure.me, (13) pass4sureacademy.com, (14) pass4surebraindumps.com, (15) pass4surecerts.com, (16) pass4surecram.com, (17) pass4suredumps.com, (18), pass4suredumps.in, (19) pass4sureexam.co, (20) pass4sureexam.net, (21) pass4sureit.com, (22) pass4surenotes.com, (23) pass4sures.co, (24) pass4sures.com, (25) pass4suress.com, (26) pass4suretest.com, (27) passforsure.co, (28) passforsure.me, (29) realrestking.net, (30) testking.in, (31) testkingcert.com, (32) testkingcissp.com, (33) testkingcram.com, (34) testkingdumps.com, (35), testkingone.net, and (36) testkingonline.net. (Doc. 7 at 2–4). During the hearing held on Friday, August 26, 2016, plaintiffs' counsel agreed that some of those domain names should not be subject to this temporary restraining order because there is a question as to whether defendants actually own them. Those domain names are: (1) originaltestking.com, (2) originaltestking.net, (3) realtestking.net, (4) testking.in, (5) testkingcert.com, (6) testkingcissp.com, (7) testkingone.net, and (8) testkingonline.net. (Doc. 7 at 43 (the "Cluster D" domain names)). As a result, those eight domain names are not subject to this temporary restraining order.

testking.com and pass4sure.com and use those websites to advertise and sell their test preparation materials. (Doc. 5, Exs. 1–4).

Defendants own and operate 36 different websites whose domain names use plaintiffs' trademarks or variants thereof. The websites' pages contain thousands of unauthorized uses of plaintiffs' trademarks. For example, plaintiffs' investigation discloses that defendant Selftesttraining owns and operates the websites allpass4sure.com, pass4surebraindumps.com, pass4suredumps.in, pass4sureexam.co, and pass4sures.co. (Doc. 7 at ¶ 16). Collectively, those websites contain at least 6,088 unauthorized uses of the PASS4SURE® mark. (*Id.*) Plaintiffs' investigation also discloses that defendant Ariel James owns and operates the websites ccnapass4sure.com, freepass4sure.com, pass4suredumps.com, passforsure.co, and testkingdumps.com. (*Id.* at ¶ 86). Plaintiffs' investigation further discloses that those websites have, respectively, at least 2,692 and 1,030 unauthorized uses of the PASS4SURE® and TEST KING® marks. (*Id.*)

Defendants use their websites to sell test preparation materials in the information technology field, some of which also include unauthorized uses of plaintiffs' trademarks. (*Id.* at ¶ 52). Defendants have also used plaintiffs' trademarks as keywords in the metadata of some of defendants' websites, which increases the chance that defendants' websites will appear when someone uses plaintiffs' trademarks to search for plaintiffs' products on the Internet (for example, by performing a Google search for TEST KING® materials). (Doc. 7 at 9 and attachments 15, 69, 106, 146, 189, 207, 217, 223). Plaintiffs' investigation discloses that defendants collectively claim in their advertisements to have served over 800,000 customers on defendants' websites. (*Id.* at 82–83). Defendants' websites use at least one of the following

3

companies to process online payments: Digital River® MyCommerce, Inc.; CCNow, Inc.; Avangate; Sage Pay; Paysafe Group; FastSpring; PayPro Global; and PayPal. (*Id.* at 8–9).

Plaintiffs allege that defendants' intentional misuse of plaintiffs' trademarks (or variants thereof) in defendants' domain names and on defendants' websites deceives and confuses customers and essentially allows defendants to pass off defendants' products as if they were produced by plaintiffs. As a result, plaintiffs bring claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114, cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and related state law claims for unfair competition and conspiracy to injure a business.

Plaintiffs seek to recover all illegal profits attributable to those alleged violations, pursuant to 15 U.S.C. § 1117. Additionally, plaintiffs request a temporary restraining order, pursuant to Rule 65(b), Fed. R. Civ. P., that enjoins the unauthorized use of their trademarks, prohibits the transfer of defendants' domain names during this action, preserves evidence, and freezes defendants' accounts at the online payment processing companies. Plaintiffs contend that the temporary restraining order should issue without notice because defendants' clear violation of federal trademark and cybersquatting laws warrants the reasonable belief that defendants will conceal or transfer their illegal profits and destroy incriminating evidence.

## II.

### A.

Before the matter is addressed on the merits, several threshold issues require resolution. Defendants Kashif Rashid, Jamal Ramzan, and Alpolink (UK) Ltd., by counsel, raised the questions, orally and in their written pleading, whether both subject matter jurisdiction and personal jurisdiction exist in this case (Doc. 11). Specifically, defendants Rashid, Ramzan, and

Alpolink (UK) Ltd. contend that, because different defendants own different domain names, jurisdiction does not exist over each named party. By contrast, plaintiffs' sworn declaration indicates that defendants acted in concert, and that defendants jointly operate the allegedly infringing domain names. (Doc. 7 at ¶¶ 25, 29 33, 37, 72.1, 103.1, 129, 144).

With respect to subject matter jurisdiction, defendants argue that plaintiffs contractually agreed to submit to the jurisdiction of the Cayman Islands. The Fourth Circuit's decision in *Hawes v. Network Solutions, Inc.*, however, appears dispositive of that issue. 337 F.3d 377 (4th Cir. 2003). Plaintiffs' trademark claims against defendants, by definition, arise under federal law; accordingly, federal question subject matter jurisdiction exists. *See id.* at 383.[3]

Similarly, the facts in the sworn declaration are sufficient, at this stage in the litigation, to establish personal jurisdiction for purposes of issuing a temporary restraining order. As relevant here, Virginia's long arm statute, Va. Code § 8.01-328.1, provides two grounds for specific personal jurisdiction. First, the Code provides that a court may exercise personal jurisdiction over a defendant whose acts arise from that defendant's "transacting any business" in Virginia. § 801-328.1(A)(1). Second, the Code provides that personal jurisdiction exists if the cause of action arises from a defendant's extra-territorial act "causing tortious injury in this Commonwealth," so long as that defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth." § 801-328.1(A)(4).

---

[3] The defendants' written submission raises an objection as to joinder, but given that plaintiffs' sworn declaration indicates that defendants own all of the websites at issue, that objection at this point fails, although it may be raised at the Rule 12(b) stage. At the hearing on Friday, defendants' counsel also raised an objection based on laches. We do not have enough facts at this stage to decide that issue, and as a result express no opinion on it. Defendants are free to raise that argument at a later stage.

5

In this regard, plaintiffs have alleged a prima facie case sufficient to meet both prongs of Virginia's long-arm statute. On the first prong, § 801-328.1(A)(1), plaintiffs' sworn declaration indicates that defendants, acting in concert, transacted business through one of their websites with at least one person in Virginia. (Doc. 7, ¶¶ 25, 29 33, 37, 72.1, 103.1, 112, 129, 137, 144). On the second prong, § 801-328.1(A)(4), it is clear that trademark infringement causes a tortious injury. *See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 312 n.10 (4th Cir. 2012) (describing trademark infringement as a tort). Nor is there any doubt that plaintiff has made a prima facie case that trademark infringement has occurred in transactions in Virginia, or that defendants have regularly conducted business within the Commonwealth. (*See* Doc. 7 at ¶¶ 25, 29 33, 37, 72.1, 103.1, 129, 144); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1354 (11th Cir. 2013) (observing that, under a long-arm statute analogous to Virginia's, a website that sold infringing goods caused tortious injury in the state in which the purchaser was located and where the website was accessible). For those reasons, the record at this stage is sufficient to determine that personal jurisdiction over defendants exists for purposes of a temporary restraining order.[4]

**B.**

This court has authority to "grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent a violation of any right of the registrant of a mark registered in the Patent and Trademark Office" or to prevent a violation of the ACPA. 15 U.S.C. § 1116(a). To receive a temporary restraining order, plaintiffs must show: (1) a likelihood of success on the merits of their trademark infringement and cybersquatting claims,

---

[4] Nothing in this Order should be read to preclude any named defendant in this matter from raising, in his next responsive pleading and pursuant to Rule 12(b)(2), Fed. R. Civ. P., the question whether personal jurisdiction exists.

(2) that they are "likely to suffer irreparable harm in the absence of [a temporary restraining order]," (3) that "the balance of equities tips in [their] favor," and (4) that a temporary restraining order "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Rule 65(b)(2), Fed. R. Civ. P. (stating that a court must describe why the movant's injury is immediate and irreparable before issuing a temporary restraining order). Rule 65(b)(2) also requires a court to state why the temporary restraining order should issue without notice.

The first issue is whether plaintiffs can satisfy those four requirements with respect to their trademark infringement claims under 15 U.S.C. § 1114. The second issue is whether plaintiffs can satisfy those same requirements with respect to their cybersquatting claims under 15 U.S.C. § 1125(d).[5] The final issue is whether issuing a temporary restraining order without notice to all of the parties is appropriate in these circumstances.

### C.

The Lanham Act prohibits the unauthorized use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The Fourth Circuit has stated that to prevail under that provision, a plaintiff must show that it has "a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995). There is no question that plaintiffs own the rights to their trademarks. (*See* Doc. 5, Exs. 9–11).

---

[5] Plaintiffs raise related claims for common law unfair competition and conspiracy to injure a business under Virginia law. Because none of plaintiffs' state law claims provide the basis for this temporary restraining order, we do not address them at this time.

7

Seven factors are used to determine whether a defendant's imitation is likely to cause confusion among consumers: (1) the protected mark's "strength or distinctiveness"; (2) the "similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the parties' advertising; (6) the defendant's intent; and (7) actual confusion." *Lone Star Steakhouse*, 43 F.3d at 933. Not all of those factors are "of equal relevance in every case." *Id.*

As for the first factor, the fact that plaintiffs' TEST KING® and PASS4SURE® marks are registered "is strong evidence" that they are distinctive. *Retail Servs. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004). In addition to registration, plaintiffs' marks are distinctive because they may be suggestive. Marks are placed in four categories that "increase in distinctiveness as follows: generic, descriptive, suggestive, and arbitrary or fanciful." *Id.* at 538. A descriptive mark merely describes "a function, use, characteristic, size, or intended purpose of the product" and is not inherently distinctive. *Id.* at 539 (quotation marks omitted) (citing "After Tan post-tanning lotion" and "5 Minute Glue" as examples). A suggestive mark, on the other hand, "connotes, without describing, some quality, ingredient, or characteristic of the product." *Id.* (quotation marks omitted) (citing Coppertone®, Orange Crush®, and Playboy® as examples). Plaintiffs TEST KING® and PASS4SURE® marks are suggestive because instead of describing the use of or a characteristic of their products, the plaintiffs' trademarks "stand for an idea which requires some operation of the imagination to connect it with the goods." *Id.* (quotation marks omitted). Because plaintiffs' marks appear to be suggestive, they are inherently distinctive. *Id.* Between the marks' registration and their apparent suggestiveness, the first factor weighs clearly in plaintiffs' favor.

8

The second factor — the similarity of the protected marks and the imitations — also weighs clearly in plaintiffs' favor. In thousands of instances, defendants did not even attempt to use a variant of plaintiffs' marks: defendants used precisely the same marks. (Doc. 7 at ¶¶ 16, 47, 67, 86, 112, 124, 137 and attachments 15, 69, 106, 146, 189, 207, 217, and 223). And as for the instances where defendants used variants of plaintiffs' marks, the substantial similarities between plaintiffs' marks and those variations are as clear as day and confusingly similar to the protected marks. For example, defendants' domain names included allpass4sure.com, originaltestking.net, pass4sureit.com, testkingcram.com, and other equally comparable names. (Doc. 7 at 2–4). The second factor clearly weighs in plaintiffs' favor.

The third, fourth, and fifth factors also weigh clearly in plaintiffs' favor. Plaintiffs use the TEST KING® and PASS4SURE® marks to sell test preparation materials. Defendants use plaintiffs' marks and all variations thereof to sell the exact same products. (*See, e.g.*, Doc. 7 at attachments 31–34, 40–41, 78, 101–02, 131, 134–139). Plaintiffs and defendants also use the internet to advertise and sell their test preparation materials.

The next factor is whether the defendants intentionally misused plaintiffs' marks. *Lone Star Steakhouse*, 43 F.3d at 933. The sheer volume of unauthorized uses of plaintiffs' marks, or close variations thereof, on defendants' websites is strong evidence that defendants are attempting to take advantage of plaintiffs' reputation in the marketplace and thereby profit from the infringement. *Cf. Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984) ("If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion.").

9

As for the final factor, there is evidence that defendants' misuse of plaintiffs' trademarks has caused actual confusion in the marketplace. Defendants claim to have served over 800,000 customers through their websites, all of which misuse plaintiffs' trademarks. (Doc. 7 at 82–83). The fact that defendants have so many customers makes it reasonable to infer that actual confusion exists given that defendants are misusing plaintiffs' marks to sell the same products via the same medium in the same marketplace. Because all seven factors weigh in plaintiffs' favor, and plaintiffs own valid trademarks, they are likely to succeed on the merits of their trademark infringement claims.

Plaintiffs also satisfy the remaining three elements for receiving a temporary restraining order. Plaintiffs' showing of a likelihood of confusion leads to a presumption of irreparable injury. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002) (stating that in "Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion"); *see also Lone Star Steakhouse*, 43 F.3d at 939 (recognizing "that irreparable injury regularly follows from trademark infringement"). And even without the presumption, plaintiffs have suffered irreparable injury because the likelihood of confusion erodes the goodwill and confidence they have created in their products. *See Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[S]howing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."). Between the likelihood of confusion and the damage to their reputation, it is clear that plaintiffs have suffered an "immediate and irreparable injury" as a result of defendants' misuse of their trademarks. *See* Rule 65(b)(1)(A), Fed. R. Civ. P. As for the third factor, the balance of equities falls in plaintiffs' favor because stopping defendants' misuse of plaintiffs' trademarks would benefit plaintiffs and impose little

(legitimate) harm on defendants. Fourth and finally, entering a temporary restraining order would "serve the public interest by preventing future consumers from being misled" by defendants' unlawful use of plaintiffs' trademarks. *Lone Star Steakhouse*, 43 F.3d at 939.

In sum, plaintiffs satisfy all four elements necessary to receive a temporary restraining order with respect to their claims of trademark infringement under the Lanham Act. By doing so, plaintiffs have shown entitlement to the relief they seek for defendants' trademark infringement. Plaintiffs' showing that they are likely to succeed on the merits and that they have suffered irreparable injury certainly justifies their request to restrain defendants' use of the trademarks. Importantly, that showing of irreparable injury also justifies their request to preserve defendants' online payment accounts. Plaintiffs have a statutory right to recover defendants' illegal profits. *See* 15 U.S.C. § 1117(a). Because defendants' misuse of plaintiffs' trademarks is so blatant, so obvious, so flagrant, it stands to reason that they are disreputable enough to conceal any of their ill-gotten gains. *See Abercrombie & Fitch Trading Co. v. 007fashion.com*, No. 13-60272-CIV, 2013 WL 654911, at *7 (S.D. Fla. Feb. 21, 2013) ("In light of the inherently deceptive nature of the counterfeiting business, and [d]efendants' blatant violation of the federal trademark laws, [p]laintiff has good reason to believe [d]efendants will hide or transfer their ill-gotten assets beyond the jurisdiction of this Court unless those assets are restrained."). Critically, preserving the assets is also necessary to ensure that plaintiffs can take advantage of their statutory right to defendants' illegal profits. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (holding that district courts have "the authority to freeze those assets which could [be] used to satisfy an equitable award of profits" under the Lanham Act).

**D.**

The next question is whether plaintiffs can show that they are entitled to a temporary restraining order with respect to claims for relief under the ACPA. To succeed on those claims, plaintiffs must show that: (1) defendants' domain names are "identical or confusingly similar to" plaintiffs' distinctive marks and (2) that defendants had a bad faith intent to profit from using plaintiffs' marks. *See* 15 U.S.C. § 1125(d)(1)(A); *see also Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005). Pursuant to this statute, the court is authorized to consider, but is not limited to, the following factors:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

*Id.* § 1125(d)(B)(i).

Plaintiffs satisfy all four requirements for a temporary restraining order with respect to their ACPA claims. For many of the same reasons plaintiffs can establish a likelihood of success

12

on the merits of their Lanham Act claims, plaintiffs are likely to succeed on their ACPA claims. Because plaintiffs' marks are registered and are apparently suggestive, they are distinctive. *See Freebies Publ'g*, 364 F.3d at 539, 542. The defendants have also clearly used marks that are "identical or confusingly similar" to plaintiffs' marks. And here, there is no need to go through every factor to show that defendants have acted in bad faith. *See Lamparello*, 420 F.3d at 319–20. Defendants have blatantly infringed on plaintiffs' marks by using plaintiffs' exact marks in defendants' domain names and in thousands of places on defendants' websites, which is far from a "bonafide noncommercial" use of those marks. *See* 15 U.S.C. § 1125(d)(B)(i)(IV), (VIII). At this point, the evidence also shows that defendants have used plaintiffs' marks to divert consumers away from plaintiffs' websites, and that defendants have been effective at doing so — potentially to the tune of 800,000 customers that could have used plaintiffs' products. *Id.* § 1125(d)(B)(i)(V). And there is no evidence at this point that defendants have used those domain names in a bonafide fashion. *Id.* § 1125(d)(B)(i)(III). Finally, as stated above, plaintiffs' marks are distinctive, which further supports a finding of bad faith. *Id.* § 1125(d)(B)(i)(IX).

Plaintiffs also satisfy the final three factors for showing entitlement to a temporary restraining order. Plaintiffs have shown irreparable harm because defendants' use of plaintiffs' marks in defendants' domain names harms plaintiffs' reputation and goodwill that plaintiffs' have built up among consumers. *Cf. Gateway E. Ry. Co.*, 35 F.3d at 1140. Entering a temporary restraining order does not impose a hardship on defendants, who are clearly infringing on plaintiffs' rights with respect to those marks. And the public interest is served by ending the confusion that defendants' violations have caused. *Cf. Lone Star Steakhouse*, 43 F.3d at 939. Plaintiffs have met the requirements for a temporary restraining order with respect to their ACPA claims. As a result, they are justified in their request that the court order that defendants' domain

names be placed in a holding account to ensure that defendants stop using the infringing domain names. *See* 15 U.S.C. § 1125(d)(1)(C) ("In any civil action involving the ... use of a domain name under this paragraph, a court may order the ... transfer of the domain name to the owner of the mark.").

### III.

A court must also state why it is issuing a temporary restraining order without notice to the parties. Rule 65(b)(2), Fed. R. Civ. P. As stated above, three of the defendants made an appearance; the others did not. In any event, issuing the temporary restraining order without notice is justified here because defendants' flagrant violation of plaintiffs' trademark rights creates a risk that defendants could act in a disreputable fashion with regard to their illegally gained profits, or could transfer the websites to other parties. *See Abercrombie & Fitch Trading Co.*, 2013 WL 654911 at *7. Issuing the temporary restraining order without notice ensures that defendants will not be able to take those actions.

Accordingly, and for good cause,

1) It is hereby **ORDERED** that plaintiffs' Motion for a temporary restraining order is **GRANTED IN PART** and **DENIED IN PART.**

2) Plaintiffs' motion for a temporary restraining order requiring defendants to preserve business records pending discovery is hereby **DENIED.**[6]

3) Plaintiffs' motion is **GRANTED** in the following respects.

4) Defendants, and any persons or entities acting on defendants' behalf, are **RESTRAINED AND ENJOINED** from using the TEST KING® mark, the PASS4SURE®

---

[6] All parties who are served with a copy of this Order are reminded that they have a legal and ethical obligation to preserve evidence relating to this case. *See, e.g.*, Rule 37(e), Fed. R. Civ. P.

14

mark, or any confusingly similar trademarks, on or in connection will all internet websites owned, operated, or controlled by defendants, including the websites hosted at the following domains: allpass4sure.com, apass4sure.net, apass4sures.com, apass4sures.net, ccnapass4sure.com, freepass4sure.com, ipass4sures.co, pass4-sure.com, pass-4sure.com, pass4sure.me, pass4sureacademy.com, pass4surebraindumps.com, pass4surecerts.com, pass4surecram.com, pass4suredumps.com, pass4suredumps.in, pass4sureexam.co, pass4sureexam.net, pass4sureit.com, pass4surenotes.com, pass4sures.co, pass4sures.com, pass4suress.com, pass4suretest.com, passforsure.co, passforsure.me, testkingcram.com, and testkingdumps.com.

5) Defendants are further **RESTRAINED AND ENJOINED** from any further use of the TEST KING® mark, the PASS4SURE® mark, or any confusingly similar trademarks within domain names, meta tags, or other markers within website source code, from use on any webpage (including as the title of any web page), any advertising links to other websites, from search engines' databases or cache memory, and any other form of use of such terms which is visible to a computer user or serves to direct computer searches to the websites set forth in paragraph 4 above.

6) It is further **ORDERED** that the existing top-level domain registries for the domain names listed in paragraph 4 above shall take steps to **CHANGE THE REGISTRAR OF RECORD** for the domain names listed in paragraph 4 above to the Registrar GoDaddy.com, Inc., which shall hold them in a holding account pending further order of the Court. Additionally, once this change has been effected, the domain names **SHALL BE PLACED ON LOCK STATUS**, preventing the modification, deletion, or transfer of the domains by

defendants or the registrar. Plaintiffs are further **DIRECTED** to serve a copy of this Order to the existing registrar of each domain name enumerated above.

7) In addition, it is further **ORDERED** that defendants' accounts with Digital River MyCommerce, Inc., CCNow, Inc., Avangate, Sage Pay, Paysafe Group (NETBANX), FastSpring, PayPro Global, and PayPal that are related to the domain names in paragraph 4 above, including any and all linked or associated accounts, be **PRESERVED AND MAINTAINED**. Defendants, and any persons or entities acting on their behalf, are furthermore **RESTRAINED AND ENJOINED** from transferring, disposing of, or encumbering, any of the following accounts or assets:

(i) any Digital River MyCommerce, Inc., CCNow, Inc., Avangate, Sage Pay, Paysafe Group (NETBANX), FastSpring, PayPro Global, and PayPal account in the name of, linked to, or otherwise associated with defendants;

(ii) any account with or held by financial institutions located within the United States or which otherwise use United States commerce that is owned or controlled by defendants, or which receive or distribute funds from or on behalf of defendants; and

(iii) any bank account or other types of accounts linked to, associated with, or receiving deposits from any of defendants accounts with Digital River MyCommerce, Inc., CCNow, Inc., Avangate, Sage Pay, Paysafe Group (NETBANX), FastSpring, PayPro Global, and PayPal.

8) The aforementioned financial institutions are further **DIRECTED** to provide to plaintiffs the following information as soon as practicable:

(i) the identity, including bank name and location, of the account holder and account number linked to, associated with, or receiving deposits from any of defendants' accounts with

Digital River MyCommerce, Inc., CCNow, Inc., Avangate, Sage Pay, Paysafe Group (NETBANX), FastSpring, PayPro Global, and PayPal.;

(ii) the account holder, address or contact information, and current balance for each account subject to this Order.

9) Plaintiffs are further **DIRECTED** to serve the aforementioned financial institutions with copies of this Order. Plaintiffs are further **DIRECTED** to serve defendants with copies of all account information received in connection with this Order.

10) It is further **ORDERED** that plaintiffs serve a copy of this temporary restraining order on all defendants. Plaintiffs' request that they be allowed to effect service (including of the complaint and any supporting documentation) via email is **GRANTED**.[7]

11) Plaintiffs are further **ORDERED** to post a bond or surety in the amount of $10,000 by close of business, Tuesday, August 30, 2016, pursuant to Rule 65(c), Fed. R. Civ. P.

12) It is further **ORDERED**, pursuant to Rule 65(b)(3), Fed. R. Civ. P., that a hearing on this matter is **SCHEDULED** for 2:00 P.M. on Friday, September 16, 2016, to address whether it is appropriate to convert this temporary restraining order to a preliminary injunction.

---

[7] Rule 4(f)(3), Fed. R. Civ. P., provides for "other means not prohibited by international agreements" to serve defendants in foreign countries. In this regard, a trial court has discretion to consider the facts of each case and determine whether to permit service of process via email. *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002) (endorsing service of process through email in appropriate circumstances, and leaving it to the discretion of the district court to "balance the limitations of email service against its benefits in any particular case" under Rule 4(f)(3), Fed. R. Civ. P.). Given the particular circumstances of this case, it is appropriate to permit plaintiffs to effect service via email. Importantly, plaintiffs have discovered nearly all of the email addresses associated with the registrants of the infringing domain names. In addition, defendants have engaged in widespread use of the Internet to sell their test certification materials, further indicating that service via email would be effective in this case. Accordingly, email (in addition to the standard mail) is a proper method of serving defendants.

It is further **ORDERED** that this Order shall remain in full force and effect for 21 days after its entry, until the hearing at 2:00 p.m. on Friday, September 16, 2016. Although Rule 65(b)(2), Fed. R. Civ. P., provides that a temporary restraining order can remain in full force and effect for only 14 days, it can be extended for another 14 days for good cause. Good cause exists here because defendants are located overseas, notice to them will take longer, and these parties will need time to prepare to participate in that preliminary injunction hearing.

It is further **ORDERED** that the parties may file additional memoranda as to whether a preliminary injunction should issue, but they must simultaneously file any further memoranda by 5:00 p.m. on Wednesday, September 14, 2016. The parties may, by counsel, agree to an extension of this schedule if they wish to do so.

The Clerk is directed to send a copy of this Order to all counsel of record and all defendants.

Alexandria, Virginia
August 26, 2016

T. S. Ellis, III
United States District Judge